**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CORNELL UNIVERSITY, CORNELL RESEARCH FOUNDATION, INC., LIFE TECHNOLOGIES CORPORATION, and APPLIED BIOSYSTEMS, LLC, | : : : : : | |
| Plaintiffs, | : | C. A. No. 10-433-LPS-MPT |
| | : | |
| v. | : | |
| | : | |
| ILLUMINA, INC., | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

**I. INTRODUCTION**

On May 10, 2010, Cornell University, Cornell Research Foundation, Inc. (collectively, "Cornell"), Life Technologies Corporation ("Life Technologies"), and Applied Biosystems, LLC ("Applied Biosystems") (collectively, "plaintiffs") brought this action against Illumina, Inc. ("defendant"), alleging infringement of eight patents.[1] Defendant answered on August 23, 2010, asserting counterclaims seeking declaratory judgment of invalidity and non-infringement of each patent.[2] Defendant did not initially plead any affirmative defenses or counterclaims concerning a covenant not to sue.[3] On October 4, 2010, defendant amended its answer to include that plaintiffs' claims are barred, as to Life Technologies and Applied Biosystems, based on a "grant of a

---

[1] D.I. 1.
[2] D.I. 13 at 16-18.
[3] *Id.* at 15-18.

covenant not to sue [defendant]."[4]

Thereafter, defendant filed a motion to bifurcate the covenant issue, and stay the patent infringement case, pursuant to FED. R. CIV. P. 42(b).[5]  While that motion was pending, plaintiffs amended their complaint to add claims of infringement for three additional patents.[6]  On October 20, 2011, the court granted defendant's motion to bifurcate and stay.[7]

Subsequently, defendant filed its amended answer and counterclaims to plaintiffs' first amended complaint.[8]  In this pleading, defendant added a counterclaim for breach of the same contract that served as the basis for its covenant not to sue affirmative defense.[9]  On May 23, 2012, a Report and Recommendation was issued granting plaintiffs' motion to dismiss defendant's breach of contract counterclaim, under FED. R. CIV. P. 12(b)(6), for failure to state a claim upon which relief can be granted, and denying defendant's request to file an amended counterclaim, pursuant to FED. R. CIV. P. 15(a).[10]  The Report and Recommendation was adopted by the Honorable Leonard

---

[4] D.I. 15 at 15, ¶ 6.

[5] D.I. 26.  The supporting brief is found at D.I. 27.

[6] D.I. 63.  As a result, the patents-in-suit include:  U.S. Patent Nos. 6,797,470 (the "'470 patent"); 7,083,917 (the "'917 patent"); 7,166,434 (the "'434 patent"); 7,312,039 (the "'039 patent"); 7,320,865 (the "'865 patent"); 7,332,285 (the "'285 patent"); 7,364,858 (the "'858 patent"); 7,429,453 (the "'453 patent"); 7,892,746 (the "'746 patent"); 7,892,747 (the "'747 patent"); and 7,893,233 (the "'233 patent"). According to plaintiffs, the '747 patent, "asserted only against a product line that Illumina concedes is not covered by the covenant not to sue (D.I. 88 ["Stipulation"]), is not at issue in the bifurcated proceedings."  D.I. 173 at 4 n.3.

[7] D.I. 82 (Transcript of Oral Argument Hearing) at 48:7-11.

[8] D.I. 92.

[9] Id. at 25, ¶¶ 34-40.

[10] D.I. 157.

P. Stark on June 29, 2012.[11]  Presently before the court are the defendant's[12] and

plaintiffs'[13] cross-motions for summary judgment on the covenant not to sue issue, and

plaintiffs' motion to strike.[14]  The parties' cross-motions for summary judgment are

directed to a covenant not to sue contained in a settlement and cross license agreement

("Settlement Agreement") between Applera Corporation ("Applera") and defendant

Illumina.[15]  Before considering the parties' respective arguments in their cross-motions

for summary judgment, however, the court must address plaintiffs' motion to strike.

## II.     Motion To Strike

### A.     Summary of Arguments

In their motion to strike, plaintiffs argue:[16]

(1) Defendant's reply brief[17] relies on inadmissible evidence from an incomplete

record on the parties' settlement negotiations, including the negotiation history, draft

settlement agreements, and correspondence.

---

[11] D.I. 165.

[12] D.I. 167.  The briefs and supporting documents are found at D.I. 168 (defendant's opening brief) and D.I. 169 (declaration of David G. Hanson, counsel for Illumina).

[13] D.I. 172.  The briefs and supporting documents are found at D.I. 173 (plaintiffs' consolidated opening brief and answering brief), D.I. 174 (appendix A), and D.I. 175 (appendix B).

[14] D.I. 184.  The briefs and supporting documents are found at D.I. 185 (plaintiffs' opening brief), D.I. 186 (plaintiffs' appendix), D.I. 195 (defendant's answering brief), D.I. 196 (declaration of Jessica Hutson Polakowski, counsel for Illumina), and D.I. 199 (plaintiffs' reply brief).

[15] *See* D.I. 169, Ex. 3 (Settlement Agreement).  After executing the Settlement Agreement, Applera went through a series of business transactions/mergers and name changes, the consequences of which are at the root of the parties' summary judgment arguments.

[16] D.I. 185 at 3.

[17] D.I. 179.

(2) Defendant's reply brief contains arguments and alleged facts that were not included in defendant's opening brief.

### B.    Discussion

Plaintiffs move to strike portions of defendant's response to plaintiffs' motion for summary judgment and reply in support of defendant's motion for summary judgment.[18] Plaintiffs contend defendant's arguments violate the parties' confidentiality agreements, the California mediation privilege,[19] and this court's Local Rules governing the form and contents of briefs, memoranda of points and authorities, and appendices.[20]  More specifically, they argue defendant's reply brief relies on inadmissible evidence from an incomplete, and therefore, inaccurate record of the parties' settlement negotiations, and contains arguments and facts not included in defendant's opening brief.[21]  Defendant notes motions to strike under FED. R. CIV. P. 12(f)[22] are "generally disfavored, unless the matter is clearly irrelevant to the litigation or will prejudice the adverse party."[23] Additionally, "[w]hen ruling on a motion to strike, the [c]ourt must construe all facts in favor of the nonmoving party and deny the motion if the defense is sufficient under law. Further, a court should not grant a motion to strike a defense unless the insufficiency of the defense is clearly apparent."[24]

---

[18] D.I. 179.

[19] Cal. Evid. Code § 1119 (2012).

[20] D. Del. LR 7.1.3(c)(2).

[21] D.I. 185 at 3.

[22] "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f).

[23] *Seidel v. Lee*, 954 F. Supp. 810, 812 (D. Del. 1996).

[24] *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 356 (D. Del. 2009) (internal quotations and citations omitted).

4

**1.     Inadmissible Evidence - Settlement Negotiations and Settlement Agreement Drafts**

Plaintiffs contend defendant's reply brief relies on inadmissible evidence from the parties' settlement negotiations.  For the following reasons, plaintiffs' motion to strike inadmissible evidence from the settlement negotiations is granted.

**a.     Negotiation Record**

Plaintiffs note defendant and Applera[25] entered into a confidentiality agreement where "any information discussed, exchanged, or disclosed" during negotiations "will be used only for settlement purposes" and not for "discovery or at trial or for any other purpose in any proceeding or litigation."[26]  Thus, they argue defendant cannot rely on the negotiation history to clarify the terms "Defined Product," "Blocking Patents," and "necessarily infringed."[27]  Defendant counters, by relying on material covered by the confidential agreements in their opening brief, plaintiffs "opened the door to the use of the 'negotiation record,' and equity requires that [defendant] also be allowed to rely on this evidence."[28]

As to defendant's argument, plaintiffs contend they objected to defendant's evidence as inadmissible, and cited a settlement related document should the evidence be admitted.[29]  Plaintiffs maintain such an "evidentiary proffer is a well-accepted tool of trial, and eliminates the unfairness of having an incomplete record should the objection

---

[25] As discussed below, Applera is the predecessor of plaintiff, Applied Biosystems.
[26] D.I. 175, Confidentiality Agreement at B144-47.
[27] D.I. 185 at 4.
[28] D.I. 195 at 5 (citing D.I. 173 at 9).
[29] D.I. 185 at 6.

about admissibility turn out to be wrong."[30]

While defendant does not cite any authority to support its proposition, evidence from the settlement agreement can be used if "offered for a purpose other than to prove the specific details of a negotiated claim."[31]  "Evidence of agreements in general, or a policy of making a particular type of agreement may be relevant and not prohibited by Rule 408 as long as it 'does not extend to the terms of those licenses granted in settlement of litigation.'"[32]  Even if plaintiffs "opened the door," that door should remain closed where plaintiffs' references to the settlement agreement were inappropriate, and neither parties' evidence would be admissible.

Plaintiffs maintain defendant's arguments on pages nineteen to twenty-two of its reply brief,[33] based on the parties' settlement negotiations, are inadmissible.  Because defendant relies upon settlement negotiations to prove the specific details or terms, the arguments based upon the parties' settlement negotiations contained in pages nineteen to twenty,[34] and twenty-one to twenty-two,[35] of defendant's reply brief are inadmissible.[36]

---

[30] *Id.*; *see also* FED. R. EVID. 103(a)(2).

[31] *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435, 440 (D. Del. 2007).

[32] *Id.* (citation omitted).

[33] D.I. 179.

[34] Specifically, the inadmissible language is from "[e]vidence from the parties' negotiations of the Agreement conclusively shows that 'Defined Products' was intended to cover both BeadChip and SAM" to "[a]ccordingly, the Court should reject Plaintiffs' attempt to limit the definition of 'an Illumina BeadArray' to a single product (fiber-optic based SAMs), instead of the broader meaning agreed to by the parties."  D.I. 186, Ex. A at 19-20.

[35] *Id.*, Ex. A at 21-22.

[36] The court's conclusion equally applies to plaintiffs' argument regarding defendant's opening brief ("[t]he Parties' negotiations demonstrate that 'Defined Product' includes SAM and BeadChip," and "[t]he parties' negotiations support [defendant's] interpretation" of "necessarily infringed.")  D.I. 179 at 19-22.  Plaintiffs also

### b.    California Mediation Privilege

The California mediation privilege bars the admissibility, discovery, and disclosure of any evidence, including writings and communications, "prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation."[37] An exception to § 1119 exists if the parties expressly agree in writing to waive the protection.  Plaintiffs represent no such consent exists here.[38]  Defendant contends a private contract cannot constrain the court's ability to admit or exclude relevant evidence,[39] and "[a]n appropriate protective order can alleviate problems and concerns regarding both confidentiality and scope of the discovery material produced in a particular case."[40]

Plaintiffs point out when there is a question of general contract interpretation, the

---

contend even if defendant had raised these arguments at the proper time, plaintiffs would have had difficulty responding because defendant blocked discovery on the negotiations. D.I. 185 at 9.  Likewise, they allege they would also have difficulty responding to defendant's other arguments that "Illumina negotiated for and secured *broader* freedom by requiring inclusion of *more*, not fewer, amplification methods," and defendant's contention that the Settlement Agreement's to "an Illumina BeadArray" is "broader" than the earlier language.  *Id.* at 9-10 (citing D.I. 179 at 22).  Again, the negotiation history is inadmissible.

[37] Cal. Evid. Code § 1119 (2012).

[38] *Id.* § 1122.

[39] D.I. 195 at 5-8; *see also* FED. R. EVID. 402; *Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000) ("when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule" (citation omitted)).  Defendant argues because plaintiffs breached the confidentiality agreements first, they cannot now enforce the agreements.  *See Durrell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 697 (2010) ("[I]t is elementary that one party to a contract cannot compel another to perform while he himself is in default." (alteration in original) (citation omitted)).  As discussed, the negotiation history is inadmissible.

[40] *USAA Cas. Ins. Co. v. Smith*, C.A. No. 1:10CV115, 2012 WL 967368, at *6 (N.D. W. Va. Mar. 21, 2012) (citation omitted).

court looks to applicable state law.[41]  "[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."[42] Plaintiffs argue that presently, "the only issues ripe for decision by the Court are contract interpretation issues governed by state law."[43]  Since the law to be applied at this stage is state law, that is, California law, which specifically addresses the use of writings and communications in mediation, the previously noted arguments contained in pages twenty-one to twenty-two[44] of defendant's reply brief are inadmissible.

### c.   Incomplete Record

Plaintiffs maintain defendant "created an incomplete factual record and blocked discovery on the very negotiations it relies on in its reply brief," and should not be allowed to rely on the negotiation history.[45]  By such conduct, plaintiffs argue defendant "has used the confidentiality agreements and the California mediation privilege as a shield against discovery and, therefore, should not be allowed to use self-serving parts of the negotiation history as a sword in its motion for judgment."[46]

Defendant counters, because plaintiffs did not agree to waive any rights under

---

[41] *St. Clair Intellectual Prop. Consultants, Inc. v. Palm, Inc.*, C.A. No. 06-404 JJF-LPS, 2009 WL 1220546, at *8 (D. Del. May 4, 2009); *Texas Instruments Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1329 (Fed. Cir. 2000) (applying California state law to interpret license agreement).

[42] FED. R. EVID. 501.

[43] D.I. 199 at 2-3.

[44] D.I. 186, Ex. A at 21-22.

[45] D.I. 185 at 4-5; *see also* D.I. 186, Ex. B (plaintiffs' subpoena to produce documents); *id.*, Ex. C (objecting to subpoena pursuant to California mediation privilege and the confidentiality agreements); *id.*, Ex. D (offering to produce requested information if "clients (specifically, Applied Biosystems) waive any rights they may have under the September 18, 2003 confidentiality agreement"); *id.*, Ex. E (refusing to waive rights).

[46] D.I. 185 at 5.

the September 18, 2003 confidentiality agreement in return for production of documents, "it was Plaintiffs, not Illumina, who blocked discovery of this information."[47] As such, it alleges "[p]laintiffs should not be entitled to use the parties' negotiation history as both a shield and a sword, presenting partial evidence of the parties' negotiation history, and, at the same time, preventing Illumina from offering its evidence of the negotiation history, which would provide a complete and accurate record."[48] Nevertheless, for the reasons discussed above, because information disclosed during negotiations is inadmissible for discovery or at trial or for any other purpose in any proceeding or litigation, the incomplete record issue is moot.

### 2.    Inadmissible Evidence - New Arguments and Alleged Facts

Plaintiffs point out a party may not "reserve material for the reply brief which should have been included in a full and fair opening brief."[49]   They contend defendant's reply brief "raised numerous new arguments and cited new evidence that could have, and should have, been raised in its opening brief."[50]   Defendant argues its "reply" brief was actually a "reply in support of its own motion for summary judgment, *combined with* a response to Plaintiffs' own motion for summary judgment" pursuant to the briefing schedule.[51]   As such, the arguments and evidence in defendant's brief were "either explicitly contained within Illumina's initial brief or directly responsive to an argument

---

[47] D.I. 195 at 8.
[48] *Id.* at 9.
[49] D. Del. LR 7.1.3(c)(2); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 562 n.168 (D. Del. 2008); *Rockwell Techs., LLC. v. Spectra-Physics Lasers, Inc.*, C.A. No. 00-589 GMS, 2002 WL 531555, at *3 (D. Del. Mar. 26, 2002).
[50] D.I. 185 at 7.
[51] D.I. 195 at 9.

raised by Plaintiffs."[52]  Plaintiffs note while defendant was given twenty pages for its

answering brief to oppose plaintiffs' cross motion,[53] and ten pages in its reply brief to

address plaintiffs' answering brief,[54] through its conflated answering and reply brief,

defendant reserved material for its reply brief which should have been in its opening

brief.[55]

> Plaintiffs state:

> Illumina moved for summary judgment on the following three discrete
> issues addressed in its opening brief:  (1) that the lawsuit is barred by the
> covenant not to sue in the 2004 Agreement (based on the definitions of
> "Defined/Modified Defined Product," "Blocking Patents," and "Excluded
> Patent Claims"); (2) that the Cornell Plaintiffs and Applied Biosystems lack
> standing; and (3) that Life Technologies and Applied Biosystems are
> bound by the covenant not to sue.[56]

Further:

> Plaintiffs answered Illumina's motion and opened on their cross-motion,
> moving on the following four **independent** grounds:  (1) that Life
> Technologies is not bound by the covenant not to sue; (2) that the Cornell
> Plaintiffs are not bound by the covenant not to sue; (3) that the Cornell
> Patents are not "owned or licensed by Applera" and therefore are not
> "Blocking Patents" covered by the covenant; and (4) that the Cornell
> Patents are not "necessarily infringed['] by the "Defined Product" and,
> therefore, are not "Blocking Patents."[57]

At first blush, many of the aforementioned issues overlap.  Defendant's brief

does not clearly delineate where its answering or reply briefs begin and end.[58]  Despite

these concerns, the court will address defendant's combined brief, and plaintiff's claims

---

[52] *Id.* at 10.
[53] D.I. 173.
[54] *Id.*
[55] D.I. 199 at 7-8; *see also* D. Del. LR 7.1.3.
[56] *Id.* at 7 (citing D.I. 168).
[57] *Id.* at 7-8 (citing D.I. 173).
[58] D.I. 168.

of new arguments and new alleged facts.[59]

### a.   New Arguments

For the following reasons, plaintiffs' motion to strike new arguments is granted in part and denied in part.

### i.   Evasion of the Covenant

Plaintiffs contend defendant merely speculates that they "shifted patent license rights to evade the Covenant, in derogation of Illumina's rights."[60]  Defendant counters that no new argument exists in its combined brief, and plaintiffs are merely contorting the facts regarding the mergers and acquisitions to avoid their obligations under the Settlement Agreement, including the covenant.[61]  Despite each side's spin, and, even if defendant's comment is mere conjecture, the court agrees this is not a new argument.

### ii.   Readers

Plaintiffs maintain defendant argues, for the first time in its reply brief, that "Illumina's *readers*, used to practice GoldenGate and DASL, also fall within the definition of Defined Products."[62]  They point out defendant's opening brief only argued "Illumina's GoldenGate™ and DASL™ assays, performed using BeadChip arrays, 'SAM' or VeraCode beads – are Defined and Modified Defined Products, respectively."[63]

---

[59] D. Del. LR 5.1.2.

[60] D.I. 179 at 4 n.5, 17; *see also* D.I. 174 at A087-88, Jay Flatley, Illumina's CEO, Deposition at 160:17-161:4, 161:13-20 (admitting nothing is improper or unfair about a reverse triangular merger).

[61] D.I. 168 at 5 (stating, in defendant's opening brief, "[p]laintiffs' attempts to contort the mergers and acquisitions described above in order to evade their obligations flout the letter and spirit of the Agreement").

[62] D.I. 179 at 17.

[63] D.I. 168 at 1.  Plaintiffs also argue even if defendant's reliance on the negotiation history is not improper, defendant should have included in its opening brief

11

Defendant contends because plaintiffs argued genuine material factual issues exist regarding whether the accused assays, Bead-Based products and *readers* fall within "Defined Products," it is allowed to respond to plaintiffs' arguments.[64]  The court finds defendant, in its combined brief,[65] merely responds to arguments raised in plaintiffs' answering brief on the issue of readers and Defined Products, and is not improperly raising new argument.[66]

### iii.    "Essentially Identical" And "Exactly The Same"

Plaintiffs contend defendant's argument that "Illumina's GoldenGate and DASL assays performed using VeraCode Beads are Modified Defined Products"[67] is premised on the assertion in defendant's opening brief that "[t]he chemistry of the GoldenGate or DASL assay performed using VeraCode Beads is *essentially identical* to the chemistry used to perform steps one through four of Exhibit 1 using SAM and BeadChip as of August 2004."[68]  In its reply brief, defendant alleges "[t]he GoldenGate and DASL assays are performed *in exactly the same manner*, using the same steps of Exhibit 1."[69] Plaintiffs maintain omitting this argument in defendant's opening brief precludes raising

---

the reference concerning the parties' negotiations as evidence that "'Defined Product' includes SAM and BeadChip."  D.I. 179 at 19-20.  Plaintiffs clearly argue in their opening brief that SAM and BeadChip are defined products.  D.I. 168 at 11-12.

[64] D.I. 195 at 11 (citing D.I. 173 at 22-25) (emphasis added).

[65] D.I. 179.

[66] *Norman v. Elkin*, 726 F. Supp. 2d 464, 468 n.2 (D. Del. 2010) (denying motion to strike because plaintiff did not reserve material for the reply brief which should be included in a full and fair opening brief, but responded to arguments raised in defendants' answering brief).

[67] D.I. 179 at 20.

[68] D.I. 168 at 12 (emphasis added).

[69] D.I. 179 at 20 (emphasis added).

it now,[70] and "to the extent that [defendant] believed that [defendant's] own documents supported its argument that assays using VeraCode beads are 'Modified Defined Products,' [defendant] should have cited that material in its opening brief."[71]

Defendant counters the "in exactly the same manner" language is consistent with the argument in its initial brief, and was merely responsive to plaintiffs' assertions concerning the similarities between the products.[72]

The parties dispute the meaning of "substantially similar" as it applies to "Modified Defined Products." As plaintiffs argue, there is a difference between "essentially identical" and "exactly the same." In its opening brief,[73] defendant uses the term "essentially identical," but notes "minor differences," suggesting a distinction between its use of the terms "essentially identical" and "exactly the same." By using a term with a more restrictive meaning in its reply brief, defendant is essentially making a new argument, and therefore, the material on page twenty concerning "Modified Defined Products"[74] is struck, along with defendant's own documents cited in support of its argument that assays are performed "in exactly the same manner."[75]

### iv.    PCR Method Patents

Plaintiffs point out defendant, in its opening brief, did not argue equating "Genetic Analysis Patents [to] PCR method patents is contrary to the express purpose of the

---

[70] D.I. 185 at 10.
[71] *Id.* (citing D.I. 180, Exs. 19-22).
[72] D.I. 195 at 12.
[73] D.I. 186, Ex. A at 20.
[74] D.I. 186, Ex. A at 20 (passage starting with "Illumina's GoldenGate and DASL assay").
[75] D.I. 180, Exs. 19-22.

claimed invention."[76]  Defendant counters it "spent nearly three pages in its initial brief addressing this argument."[77]  The court finds defendant's argument is not new as its opening brief discusses that the claims at issue do not constitute "Excluded Patent Claims" since they are not claimed inventions that are PCR methods.[78]

### b.    New Facts

Plaintiffs contend that by referencing a 2003 Illumina press release, defendant introduces new factual material in support of its argument that the Sentrix Array Matrix and BeadChip are both an Illumina BeadArray.[79]  Defendant responds the 2003 press release was publicly available, and was used to counter plaintiffs' argument that BeadChip products are not Illumina BeadArrays.[80]

In their response to defendant's opening brief, plaintiffs discuss whether BeadChip products are Illumina BeadArrays.[81]  Since this was not in the section relating to plaintiffs' opening brief, defendant is not responding to plaintiffs' argument.[82]  Rather, plaintiffs are responding to defendant's contentions, with defendant adding factual material in its reply brief not previously included in its opening brief.  Therefore, plaintiffs' motion to strike new facts is granted, and the factual material on page

---

[76] D.I. 179 at 25.
[77] D.I. 195 at 13 (citing D.I. 168 at 18-20).
[78] D.I. 168 at 18-20.
[79] D.I. 185 at 12 (citing D.I. 179 at 18).
[80] D.I. 195 at 14 (citing D.I. 196, Jessica Hutson Polakowski, counsel for Illumina, Declaration at 3, ¶ 13; *Id.*, Exs. 8, 9; D.I 173 at 24-25).
[81] *Id.* at 22-25.
[82] D.I. 168 at 11-12.

eighteen of defendant's reply brief[83] will not be considered.[84]

### 3.    Leave to File a Sur-Reply

In light of the findings herein, it is unnecessary for plaintiffs to file a sur-reply brief to purportedly "provide a full and fair opportunity to respond to [defendant's] newly raised factual and legal arguments."[85]  The court denies plaintiffs' motion to strike on three issues:  (1) the evasion of covenant argument, (2) the readers argument, and (3) the PCR method patents argument.  For the evasion and PCR method patents arguments, defendant included its position in its opening brief,[86] and plaintiffs suffer no prejudice because they had a chance to reply.[87]  As to the readers argument,[88] defendant was responding to issues raised in plaintiffs' answering brief.[89]

## III.    Cross-Motions for Summary Judgment

### A.    Legal Standard

Summary Judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[90]  Once there has been adequate time for discovery, Rule 56(c) mandates judgment against the party

---

[83] D.I. 186, Ex. A at 18.

[84] *See* D. Del. LR 7.1.3(c)(2) ("[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief").

[85] D.I. 185 at 1 n.1.

[86] *See* D.I. 168 at 5, 18-20.

[87] *Seidel v. Lee*, 954 F. Supp. 810, 812 (D. Del. 1996) (stating motions to strike under FED. R. CIV. P. 12(f) "are generally disfavored, unless the matter is clearly irrelevant to the litigation or will prejudice the adverse party").

[88] D.I. 173 at 22-25.

[89] *Norman*, 726 F. Supp. 2d at 468 n.2.

[90] FED. R. CIV. P. 56(c)(2).

who "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[91]  When a party fails to make such a showing, "there can be no 'genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[92]  The moving party is therefore entitled to judgment as a matter of law because "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[93]  A dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[94]

The moving party bears the initial burden of identifying portions of the record which demonstrate the absence of a genuine issue of material fact.[95]  However, a party may move for summary judgment with or without supporting affidavits.[96]  Therefore, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence supporting the nonmoving party's case."[97]

If the moving party has demonstrated an absence of material fact, the nonmoving party must then "come forward with specific facts showing that there is a genuine issue

---

[91] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
[92] *Id.* at 323.
[93] *Id.*
[94] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[95] *Celotex*, 477 U.S. at 323.
[96] *Id.*
[97] *Id.* at 325.

for trial."[98]  If the nonmoving party bears the burden of proof at trial, he "must go beyond the pleadings in order to survive a motion for summary judgment."[99]  That party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."[100]  At the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."[101]  Further, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[102]  The threshold inquiry therefore is "determining whether there is a need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[103]

This standard does not change merely because there are cross-motions for summary judgment.[104]  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[105]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court

---

[98] FED. R. CIV. P. 56(c).
[99] *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 22 F.3d 1260, 1273 (3d Cir. 1994).
[100] *Anderson*, 477 U.S. at 248.
[101] *Id.* at 249.
[102] *Id.*
[103] *Id.* at 250.
[104] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).
[105] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

to grant summary judgment for either party."[106]

## B.    Background

In 2004, in an attempt to resolve disputes following a joint development venture, Applera and Illumina entered into a settlement and cross license agreement ("Settlement Agreement").[107]  The Settlement Agreement included a covenant not to sue, under which "Applera . . . its Successors, or its assigns" would not bring suit against Illumina for infringement of "the Blocking Patents by the Defined Product or Modified Defined Product."[108]  The Settlement Agreement included an integration clause[109] and a California choice of law provision.[110]

Subsequent to execution of the Settlement Agreement, a series of business transactions occurred.  As recited in the parties' Stipulation of Agreed Facts:[111]

> 1) Applied Biosystems Inc. was formed on June 24, 2008 as a direct, wholly owned subsidiary of Applera Corporation.
>
> 2) Effective July 1, 2008, Applied Biosystems Inc. merged with and into Applera Corporation (the "Applied Biosystems Inc. – Applera Corporation Merger").
>
> 3) Applera Corporation continued as the surviving entity in the Applied Biosystems Inc. – Applera Corporation Merger.
>
> 4) Applied Biosystems Inc. ceased to exist as a separate corporation as a result of the Applied Biosystems Inc. – Applera Corporation Merger.

---

[106] *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

[107] D.I. 168 at 2; *see also* D.I. 169, Ex. 3 (Settlement and Cross License Agreement).

[108] D.I. 169, Ex. 3 at ¶ 4.7.  Capitalized terms, such as "Successors," "Blocking Patents," "Defined Product," and "Modified Defined Product," are defined terms in the Settlement Agreement.

[109] *Id.* at ¶ 8.2.

[110] *Id.* at ¶ 8.5.

[111] D.I. 140.

5) The name of Applera Corporation changed to Applied Biosystems Inc. as part of the Applied Biosystems Inc. – Applera Corporation Merger.

6) Atom Acquisition Corporation was formed on October 9, 2008 as a direct, wholly owned subsidary of Atom Acquisition, LLC.

7) Effective November 21, 2008, Atom Acquisition Corporation merged with and into Applied Biosystems Inc. (the "Atom Acquisition Corporation – Applied Biosystems Inc. Merger").

8) Applied Biosystems Inc. continued as the surviving corporation in the Atom Acquisition Corporation – Applied Biosystems Inc. Merger.

9) Atom Acquisition Corporation ceased to exist as a separate corporation as a result of the Atom Acquisition Corporation – Applied Biosystems Inc. Merger.

10) Atom Acquisition, LLC was formed on June 9, 2008, as a direct, wholly owned subsidiary of Invitrogen Corporation.

11) Effective November 21, 2008 and after the merger between Atom Acquisition Corporation and Applied Biosystems Inc., Applied Biosystems Inc. merged with and into Atom Acquisition, LLC (the "Applied Biosystems Inc. – Atom Acquisition, LLC Merger").

12) Atom Acquisition, LLC continued as the surviving company in the Applied Biosystems Inc. – Atom Acquisition, LLC Merger.

13) Applied Biosystems Inc. ceased to exist as a separate corporation as a result of the Applied Biosystems Inc. – Atom Acquisition, LLC Merger.

14) The name of Atom Acquisition, LLC changed to Applied Biosystems, LLC as part of the Applied Biosystems Inc. – Atom Acquisition, LLC Merger.

15) LT Name Corporation was formed on November 6, 2008 as a direct, wholly owned subsidiary of Invitrogen Corporation.

16) Effective November 21, 2008, LT Name Corporation merged with and into Invitrogen Corporation (the "LT Name Corporation – Invitrogen Corporation Merger").

17) Invitrogen Corporation continued as the surviving corporation in the LT Name Corporation – Invitrogen Corporation Merger.

18) LT Name Corporation ceased to exist as a separate corporation as a result of the LT Name Corporation – Invitrogen Corporation Merger.

19) The name of Invitrogen Corporation changed to Life Technologies Corporation as part of the LT Name Corporation – Invitrogen Corporation Merger.

In 2009, Cornell granted Life Technologies a New Exclusive Licence Agreement to the patents-in-suit ("2009 NELA").[112]

## C.    Summary of Arguments

In moving for summary judgment, defendant argues:[113]

(1) Life Technologies is bound by the covenant not to sue because it is Applera's Successor, Affiliate, and affiliate.  Applied Biosystems is bound by the covenant not to sue because it is Applera's Successor, and because after merging with Applera, Applied Biosystems stepped into Applera's shoes and assumed Applera's contractual obligations as a matter of Delaware corporate law.

(2) Cornell and Applied Biosystems lack standing to sue defendant.  Cornell contractually waived its right to sue defendant for infringement by granting Life Technologies an exclusive license to the patents-in suit and explicitly contracted away its right to sue defendant via the 2009 NELA.  Applied Biosystems has no ownership interest in the patents-in-suit.

(3) The covenant not to sue bars plaintiffs' infringement claims as it protects defendant from suits alleging infringement of the "Blocking Patents" by "Defined Products" and "Modified Defined Products."  The accused products are Defined

---

[112] D.I. 169, Ex. 2, New Exclusive License Agreement.
[113] D.I. 168 at 1-2.

20

Products and Modified Defined Products, the patents-in-suit are Blocking Patents, and the asserted patent claims are not the "Excluded Patent Claims" exempted from the covenant not to sue.

In their cross motion for summary judgment, plaintiffs argue:[114]

(1) Life Technologies is not bound by the covenant not to sue because it is not Applera, Applera's Successor, or Applera's assign.

(2) Cornell is not bound by the covenant not to sue because Cornell is not Applera, Applera's Successor, or Applera's assign.

(3) The covenant not to sue protects defendant from suits alleging infringement of the "Blocking Patents" that are "owned or licensed by Applera," and the patents-in-suit are not owned or licensed by Applera.

(4) The covenant not to sue protects defendant from suits alleging infringement of the "Blocking Patents" that "would necessarily be infringed" by the sale, manufacture, or use of the "Defined Product," and the patents in suit are not necessarily infringed because the Defined Product can be used without infringing the patents.

### D.    Discussion - Motion For Summary Judgment - Breadth of Covenant Not To Sue - Parties

Plaintiffs move for summary judgment that Cornell and Life Technologies are not bound by the covenant not to sue.  Defendant moves for summary judgment that Life Technologies and Applied Biosystems are bound by the covenant not to sue.

As noted, the Settlement Agreement is governed by California law.[115]

---

[114] D.I. 173 at 2-3.
[115] D.I. 169, Ex. 3 at ¶ 8.5.

21

Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting.  Because California law recognizes that the words of a written instrument often lack a clear meaning apart from the context in which the words are written, courts may preliminarily consider any extrinsic evidence offered by the parties.  If the court decides, after consideration of this evidence, that the language of a contract, in the light of all the circumstances, is fairly susceptible of either one of the two interpretations contended for, extrinsic evidence relevant to prove either of such meanings is admissible.  If, however, the court decides that the contract is not reasonably susceptible to more than one interpretation, the court can reject the assertion of ambiguity.[116]

Further:

The words of a contract are to be understood in their ordinary and popular sense.  A contract provision is considered ambiguous when it is capable of two or more reasonable constructions, but such provisions must be construed in the context of the instrument as a whole and cannot be found to be ambiguous in the abstract.[117]

The court may also look to dictionary definitions when determining the meaning of words in a contract.[118]  "On a motion for summary judgment, a court may properly interpret a contract as a matter of law only if the meaning of the contract is unambiguous."[119]

1.      Settlement Agreement

The preamble of the Settlement Agreement recites:

This is a Settlement and Cross Licence Agreement . . . by and between

---

[116] *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014-15 (9th Cir. 2012) (internal quotation marks, anterations, and citations omitted).

[117] *Progeny Ventures, Inc. v. W. Union Fin. Servs., Inc.*, 752 F. Supp. 2d 1127, 1132 (C.D. Cal. 2010) (internal quotation marks and citations omitted.).

[118] *Dean v. United of Omaha Life Ins. Co.*, C.A. No. 05-6067 GHK, 2007 WL 7079558, at *4 n.2 (C.D. Cal. Aug. 27, 2007) (citing *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205 (Cal. 2003)).

[119] *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, 889 F. Supp. 2d 1198, 1219 (E.D. Cal. 2012) (citation omitted).

(1) *Applera Corporation* . . . and all of its *affiliates, divisions, and Affiliates* (as defined in Article 1 of this Agreement), including but not limited to Applera Corporation – Applied Biosystems Group, an operating group of Applera Corporation . . . (*collectively, Applera Corporation and all of its affiliates and Affiliates are "Applera"*); and (Illumina, Inc. . . . and all of its affiliates, divisions, and Affiliates (collectively, Illumina, Inc. and all of its affiliates and Affiliates are "Illumina").[120]

The covenant not to sue at issue recites:

Subject to Illumina's payment pursuant to section 5.1, Applera covenants that at no time during the term of this Agreement will *it, its Successors, or its assigns* make any claim or commence or prosecute against Illumina, its officers, directors, attorneys, shareholders, affiliated or related companies, Affiliates, employees, agents, assigns, Successors, distributors, customers (direct or indirect), or other transferees any suit, action, arbitration, or proceeding of any kind based upon assertion of infringement of the Blocking Patents by the Defined Product or Modified Defined Product.[121]

The Settlement Agreement defines "Affiliate" as follows:

"*Affiliate*" means, with respect to a Party, any Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Party; where "control" refers to the ownership, directly or indirectly, of the lesser of at least fifty percent (50%) or the highest percentage permitted by applicable law of the voting securities or other ownership interests of a Person (or Party) or otherwise the ability to direct the management of such Person (or Party).[122]

"Successor" is defined as "an entity that acquires all or substantially all of the assets of Applera or Illumina, or of one or more operating divisions thereof, or an entity that merges into or with Applera or Illumina or any Affiliate of either."[123]  The agreement also

---

[120] D.I. 169, Ex. 3 at L0000201 (emphasis added).

[121] *Id.* at ¶ 4.7(a) (emphasis added).

[122] *Id.* at ¶ 1.7.  "Party" is defined as "Applera or Illumina, according to the appropriate context and usage. '*Parties*' shall mean Applera and Illumina."  *Id.* at ¶ 1.6. "Person" is defined as "any individual, group, corporation, partnership, limited liability company, joint venture, association or other organization or entity (including, without limitation, any governmental agency or political subdivision thereof).  *Id.* at ¶ 1.8.

[123] *Id.* at ¶ 1.9.

provides that the parties, Applera and Illumina, and their "successors and assigns" are "irrevocably" bound to its terms.[124]

Initially, the parties disagree as to which entities are bound by the covenant not to sue.  Plaintiffs point to the covenant's recitation that "Applera covenants that at no time during the term of this Agreement will *it, its Successors, or its assigns*"[125] as demonstrating the covenant only covers Applera, Applera's Successors, or Applera's assigns.  Defendant agrees those entities are bound, but maintains the preamble defined "Applera" as more than just "Applera Corporation":  "*Applera Corporation . . . and all of its affiliates, divisions, and Affiliates* (as defined in Article 1 of this Agreement), including but not limited to Applera Corporation – Applied Biosystems Group, an operating group of Applera Corporation . . . (*collectively, Applera Corporation and all of its affiliates and Affiliates are 'Applera'*)."[126]  According to defendant, that demonstrates the parties expanded the definition of "Applera" to include Affiliates and affiliates,[127] and, therefore, those entities are also bound by the covenant not to sue.[128]

Considering the Settlement Agreement as a whole, the court rejects defendant's position.

First, the remainder of the preamble does not support a definition of "Applera" as including Applera's Affiliates and affiliates.  As plaintiffs note, the preamble describes

---

[124] *Id.* at ¶ 8.10.

[125] *Id.* at ¶ 4.7(a) (emphasis added).

[126] *Id.* at L0000201 (emphasis added).

[127] Both "Affiliates" as defined in the Settlement Agreement and any entity qualifying as an "affiliate" under corporate common law.

[128] Neither party makes arguments based upon Applera's "assigns" (from the covenant not to sue) or Applera's "divisions" (from the preamble).

past actions of "Applera" and "Illumina,"[129] but none of those actions was taken by the

parties' Affiliates or affiliates.  Plaintiffs assert Applera and Illumina themselves took

each of the recited actions.[130]

Plaintiffs also contend the covenant not to sue granted by Illumina contains

redundant and unnecessary language if defendant's position were accepted:

> Illumina covenants that at no time will it, its Successors, or its assigns
> make any claim or commence or prosecute against *Applera*, or *its* officers,
> directors, attorneys, shareholders, *affiliated or related companies,
> Affiliates*, employees, agents assigns, Successors, distributors, customers
> (direct or indirect), or other transferees . . . .[131]

Plaintiffs point to similar redundancies that would exist if the covenant provisions

describing the covenant beneficiaries:  "Applera or its . . . affiliated or related

companies, Affiliates."[132]  The definition of "Successor" would likewise contain

redundant and unnecessary references to Applera and its Affiliates under defendant's

definition:  "A *'Successor'* shall mean . . . an entity that merges *into or with Applera* or

Illumina *or any Affiliate of either*."[133]  Finally, plaintiffs argue the references to "Affiliates"

in the releases and cross licenses would be redundant if "Applera" included its

"Affiliates":  "Applera . . . hereby fully and forever releases Illumina and its past and

---

[129] D.I. 169, Ex. 3 at L0000201 (1st-6th Recitals).

[130] Defendant did not dispute this assertion.

[131] D.I. 169, Ex. 3 at ¶ 4.8(a) (emphasis added).

[132] *Id.* at ¶ 4.8(b).  *Cf. also id.* at ¶ 4.7(a) ("Illumina, its . . . affiliated or related companies, Affiliates"); *id.* at ¶ 4.7(b) ("Illumina, its . . . affiliated or related companies, Affiliates").

[133] *Id.* at ¶ 1.9.

present . . . Affiliates";[134] "Illumina grants to Applera and its Affiliates . . . ."[135]

Because defendant's definition would be contrary to the recitals in the preamble, and create redundant and unnecessary language throughout the substantive portion of the Settlement Agreement, the court rejects defendant's position and determines the entities bound by the covenant not to sue are:  Applera, Applera's Successors, or Applera's assigns.  Based on this determination, the court need not address the parties' arguments concerning an entity's status as an Affiliate or affiliate of Applera.

### 2.    Cornell

Plaintiffs move for summary judgment that Cornell is not bound by the covenant not to sue, noting defendant never argued Cornell falls within the language of the covenant not to sue, and there is no contention Cornell was a party to the Settlement Agreement.[136]  As a result, plaintiffs maintain Cornell cannot be bound by that covenant.[137]  In briefing, defendant does not contest this issue.  Consequently, plaintiffs' motion for summary judgment that Cornell is not bound by the covenant not to sue is granted.

### 3.    Applied Biosystems

Defendant moves for summary judgment that Applied Systems is bound by the covenant not to sue because it is Applera's Successor.  Plaintiffs do not contest this

---

[134] *Id.* at ¶ 4.1.  *Cf. also id.* at ¶ 4.3 ("Illumina . . . hereby fully and forever releases Applera and its past and present . . . Affiliates").

[135] *Id.* at ¶ 4.6.  *Cf. also id.* at ¶ 4.5 (Applera grants to Illumina and its Affiliates . . . .  No right to sublicense is granted to Illumina or its Affiliates . . . .  The license does not convey to Illumina or its Affiliates any license to . . . .").

[136] D.I. 173 at 18.

[137] *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (stating "a contract cannot bind a nonparty").

issue.  In fact, they make repeated references to Applied Biosystems being Applera's

Successor in their briefs.[138]  Consequently, defendant's motion for summary judgment

that Applied Biosystems is bound by the covenant not to sue is granted.

### 4.    Life Technologies

The parties each move for summary judgment on the question of whether Life

Technologies is bound by the covenant not to sue.  Defendant asserts Life

Technologies is so bound as Applera's Successor; plaintiffs disagree with that assertion.

Defendant argues Applied Biosystems stepped into the shoes of Applera through

the string of corporate transactions described above.  Under Delaware law, the

surviving entity of a merger absorbs all rights and responsibilities of the parties to a

merger:  "all debts, liabilities and duties of the respective constituent corporations shall

thenceforth attach to said surviving or resulting corporation, and may be enforced

against it to the same extent as if said debts, liabilities and duties had been incurred or

contracted by it."[139]  Further, "the policy of the law is so clear that survival [of a merged

entity's contractual obligations] should be taken as the normal course of events."[140]

_____

[138] See, e.g., D.I. 173 at 13 ("Applied Biosystems, the corporate successor to
Applera . . . ."); id. ("Applera merged with and into Applied Biosystems, thereby making
Applied Biosystems the Successor to Applera."); ("Applied Biosystems–the Successor
to Applera . . . ."); D.I. 187 at 6 n.5 ("The fact that Applied Biosystems is a Successor to
Applera is irrelevant, as no right to the Cornell Patents now flow through Applied
Biosystems . . . .").

[139] 8 Del. C. § 259 (a).  Section 259 "appl[ies] to mergers or consolidations
between corporations and limited liability companies."  8 Del. C. 264(e).

[140] W. Air Lines, Inc. v. Allegheny Airlines, Inc., 313 A.2d 145, 154 (Del. Ch.
1973) (citation omitted); see also Fitzsimmons v. Western Airlines, Inc., 290 A.2d 682,
685 (Del. Ch. 1972) ("It is . . . a matter of statutory law that a Delaware corporation may
not avoid its contractual obligations by merger; those duties 'attach' to the surviving
corporation and may be enforced against it.'  In short, the survivor must assume the
obligations of the constituent.").

Consequently, defendant asserts that, by operation of law, Applied Biosystems is to be treated as if Applied Biosystems itself had contracted the obligations of the covenant not to sue.[141]

The Settlement Agreement defined "Successor" to mean "an entity that acquires all or substantially all of the assets of Applera or Illumina, or of one or more operating divisions thereof, or an entity that merges into or with Applera or Illumina or any Affiliate of either."  Because Life Technologies acquired all or substantially all of the assets of Applied Biosystems, which stepped into the shoes of Applera, it is bound by the covenant not to sue as a Successor to Applera.[142]  Therefore, defendant's motion for summary judgment that Life Technologies is bound by the covenant not to sue is granted, and plaintiff's motion that it is not so bound is denied.

**E.    Discussion - Motion For Summary Judgment - Breadth of Covenant Not To Sue - Infringement**

The covenant not to sue bars suits alleging infringement of "Blocking Patents" that "would necessarily be infringed" by the manufacture, use, or sale of the "Defined Product" and "Modified Defined Product," but excluding "Excluded Patent Claims."  The parties dispute whether the accused products are "Defined Products" or "Modified

---

[141] Defendant also notes the merger agreements stated:  "[f]ollowing the Merger, the separate corporate existence of the Company shall cease, and Merger Sub shall continue as the surviving company (the "*Surviving Company*") and shall succeed to assume all the rights and obligations of the Company in accordance with the DGCL and the DLLCA.").

[142] Life Technologies' 2011 annual report acknowledges the Applied Biosystems "acquisition" occurred on November 21, 2008.  D.I. 169, Ex. 17 (Life Technologies' 2011 Annual Report) ("On November 21, 2008, Invitrogen Corporation . . . , a predecessor company to Life Technologies, completed the acquisition of Applied Biosystems, Inc. . . . to form a new company called 'Life Technologies Corporation.'"); *see also* D.I. 140 (Stipulation of Agreed Facts).

Defined Products."  There is also a dispute as to whether the patents at issue are "Blocking Patents," and whether the asserted patent claims are "Excluded Patent Claims."

### 1.    "Defined Products"

According to the Settlement Agreement, a "Defined Product" is "Illumina's GoldenGate™ assay, as described in Exhibit 1, as practiced through Illumina's products and services."[143]  The fifth step of the GoldenGate™ assay involves "[d]etection of the amplicons on an Illumina BeadArray."[144]

### a.    Definition of "Illumina BeadArray"

Defendant moves for summary judgment that its Sentrix Array Matrix ("SAM") and BeadChip products constitute Illumina BeadArray Products.[145]  Plaintiffs contend disputed issues of material fact preclude summary judgment in Illumina's favor.

Defendant asserts that in contemporaneous, publicly-available documents, it made clear the term BeadArray refers to both SAM and BeadChip.  For instance, defendant's 2003 annual report stated its "BeadArray technology [has been deployed] in two different formats, the Array Matrix and the BeadChip."[146]  Further, a November 5, 2003 press release by defendant refers to BeadChip technology as BeadArray Technology.[147]  Lastly, defendant's GoldenGate™ 2004 Assay Workflow describes the

---

[143] D.I. 169, Ex. 3 at ¶ 1.2.
[144] *Id.* at L0000212.
[145] D.I. 168 at 11.
[146] D.I. 169, Ex. 19 (Illumina's 2003 Annual Report) at L0009416.  The Array Matrix is described as the "first" bead based product.  *Id.*  The Array Matrix is also referred to as the "Sentrix" Array Matrix, as the Sentrix Array Matrix is described as the "first implementation of our BeadArray Technology."  *Id.* at L0009418.
[147] *Id.*, Ex. 20 at ILMN_CRN280990.

steps of the GoldenGate assay with either SAM or BeadChip arrays.[148]

Defendant maintains Applera knew before the Settlement Agreement was executed that "BeadArray" included BeadChip technology.  In its 2004 arbitration filings, Applera defined defendant's "Assembled Arrays" to include "BeadArray™, Sentrix Array, Sentrix BeadArray, Sentrix Array Matrix, Sentrix BeadChip, Sentrix BeadChip Platform, Sentrix Multi-Array, or Sentrix Multi-Array Platform."[149]  By such admission, defendant maintains plaintiffs "cannot now limit the term 'an Illumina BeadArray' to only *one* of those products and not the variety of products - including both SAM and BeadChip products - that incorporate Illumina's fundamental BeadArray Technology."[150]

Plaintiffs contend the interpretation of "an Illumina BeadArray" is disputed, and critical for a finder of fact to determine whether the accused assays and products fall within the scope of the covenant.  For instance, plaintiffs dispute defendant's contention that "an Illumina BeadArray" is not a product, but rather broadly encompasses "BeadArray technology" and any product that encompasses that technology.[151]  They point out the phrase "BeadArray technology" is not used in the agreement, and no evidence demonstrates "BeadArray technology" is synonymous with the term "Illumina BeadArray."[152]

Plaintiffs contend a genuine issue exists as to whether the accused assays that use defendant's BeadChip and VeraCode produces to detect amplicons are "Defined

---

[148] *Id.*, Ex. 4.
[149] *Id.*, Ex. 21 at ¶ 3.
[150] D.I. 168 at 12 (emphasis in original).
[151] D.I. 173 at 22.
[152] *Id.* at 22-23.

Products."  Plaintiffs allege the parties understood the term "Illumina BeadArray" to

mean an array with tens of thousands of beads at the end of fiber optic bundles.  In

support, they reference deposition testimony,[153] SEC filings,[154] peer reviewed journal

articles,[155] scientific conferences,[156] and marketing materials.[157]  They argue their

definition is "consistent with the parties' mutual use of the term during the parties'

collaboration under the [joint development agreement],"[158] and defendant's

---

[153] D.I. 175, Jason Downing Depo. at B155, 33:20-34:7 (noting combination of "fiber optic bundles and microscopic beads"); *id.*, Paul David Grossman Depo. at B185, 228:2-10 (stating "Illumina BeadArray" was a device that "comprised a bead, a bundle of a bundle of fiberoptic fibers").

[154] *Id.* at B191, B195, B201 (noting "[t]he tens of thousands of beads at the end of the fiber optic bundle comprise our BeadArray").

[155] *Id.* at B223-24 (article describing a fiber bundle with 50,000 beads); *id.* at 238 (article describing "BeadArray™" technology with fiber-optic bundles with beads at the end of each fiber).

[156] *Id.* at B251 (presentation noting "BeadArray™" features including beads and bundles); *id.* at B270-72 (presentation describing "Arrays of Beads on Optical Fiber Bundles").

[157] *Id.* at B314 (describing Illumina's "BeadArray Reader" which acquires and images data from Illumina's "Sentrix Array Matrices"); *id.* at B316 (noting bundles in "BeadArray Reader" user guide); *id.* at B413 (noting bundles in "BeadArray Reader" user guide); *id.* at B512 (describing Illumina's "BeadArray technology" as a fiber optic based array system); *id.* at B520-21 (describing Illumina's "BeadArray technology" with "nearly 50,000 beads" in an array).

[158] *Id.*, Joint Development Agreement at B528 ("'Assembled Array' means an array of microspheres having chemical functionality attached thereto distributed on a patterned substrate . . . ."); *id.* at B565 (patent application with title of "FIBER OPTIC SENSOR WITH ENCODED MICROSPHERES"); *id.* at B816 (journal passage with title of "Bead-based Fiber-Optic Arrays"); *id.* at B821 (describing Bead Array™ as a "high throughput SNP Genotypic System based on Illumina's Bead Array technology" in product development plan); *id.* at B931 ("This document covers requirements for the hybridization fixture hardware & plate for use with an Illumina BeadArray™ matrix as used in conjunction with the Lite Brite System.  It does not cover other parts of the Lite Brite assay process, nor does it cover use of the BeadArray™ matrix in any other system" in document titled "Arrays Genotypic System - Hybridization Fixture & Plate Requirements."); *id.* at B942-62 (noting development of "Analytical Detector product that images Illumina's proprietary Array Matrix" in "Analytical Detector - Product Concept Plan"); *id.* at B175-77, 168:3-174:2 (Downing deposition testimony clarifying meaning of

"understanding of the phrase remained consistent in its court filings in the arbitration that followed a breakdown in the parties' collaboration."[159]

Plaintiffs maintain defendant's BeadChip and VeraCode products do not have tens of thousands of beads at the end of fiber optic bundles. They argue the BeadChip and VeraCode products have beads "bound by etched wells on a planar silica slide" rather than beads on the end of fiber optic bundles.[160] Plaintiffs further allege defendant admitted "VeraCode products and assays that use those products are not Defined Products . . . because they too do not have fiber optic bundles,"[161] and its readers are not "Defined Products" since the readers are not "an Illumina BeadArray."[162]

Defendant contends plaintiffs' assertion that it has not shown "BeadArray

---

terms in aforementioned development plans).

[159] *Id.* at B975 ("In its pre-collaboration experience, Illumina found that the beads loaded into the ends of the individual fibers of the BeadArrays were retained even when subjected to significant vibration.").

[160] *Id.* at B1799 (distinguishing between "Array Matrix" format and "BeadChip" format).

[161] D.I. 173 at 24 (citing D.I. 175 at B208-09, 212-13 ("Illumina's VeraCode bead platform, when used to practice Illumina's GoldenGate or DASL Assay, itself qualifies as a component of a Modified Defined Product"); D.I. 175 at B1802-03 ("VeraCode technology uses cylindrical glass microbeads" which align within a transparent groove plate)). Defendant moves for summary judgment that its GoldenGate and DASL Assays are "Modified Defined Products" when practiced using its VeraCode Beads. Because neither party moved for summary judgment that the VeraCode products are "Defined Products," the court need not address plaintiffs' argument on that point.

[162] D.I. 173 at 25 (citing D.I. 175 at B1020-21 (noting defendant states "Illumina interprets the phrase 'Illumina BeadArray' to refer to its BeadArray Technology, which is deployed on either of two multi-sample array formats, i.e., Illumina's Array Matrix and BeadChip arrays")). Although in its reply brief, defendant represents its readers, used to practice GoldenGate and DASL fall within the definition of "Defined Products," based on the assertion in plaintiff's First Amended Complaint that readers are used to perform the detection step (step 5) in Exhibit 1 (D.I. 63 at ¶ 45), neither party moved for summary judgment with respect to the accused readers. *See* D.I. 168 at 1-2 (Defendant's Summary of the Argument); D.I. 173 at 2-3 (Plaintiffs' Summary of Argument). Therefore, the court need not address this argument.

technology" is synonymous with the "Illumina Bead Array" *product* referenced in the Settlement Agreement is a straw man argument as Illumina avers it does not have, and has never had, a single product named "an Illumina BeadArray."[163]  Because plaintiffs present no evidence to rebut that representation, the court determines this argument does not raise a genuine issue of material fact.

Defendant also contends plaintiffs concede its SAM is "an Illumina BeadArray" as used in step 5 of Exhibit 1 of the Settlement Agreement with plaintiffs' statement that "[t]he evidence shows that the only product that arguably used an Illumina BeadArray during the relevant time was Illumina's Sentrix Array Matrix."[164]  The court agrees and grants defendant's motion for summary judgment that its SAM is a Defined Product.

The court also agrees with defendant that the evidence supports its assertion that at the time the Settlement Agreement was signed in August of 2004, "an Illumina BeadArray" referred to both SAM and BeadChip.  As noted above, plaintiffs' 2004 arbitration filing against Illumina defined Illumina's arrays to include both BeadChip and SAM;[165]  defendant's 2003 Annual Report stated its "BeadArray technology [has been deployed] in two different formats, the Array Matrix and the BeadChip";[166] defendant's November 5, 2003 press release referred to BeadChip as BeadArray Technology;[167] and defendant's 2004 GoldenGate assay workflow describes the steps of the GoldenGate assay with either SAM or BeadChip assays.[168]

---

[163] D.I. 179 at 17 n.17 (citing D.I. 180, Ex. 10 (Illumina's 2003 Annual Report)).
[164] D.I. 173 at 23 n.9.
[165] D.I. 169, Ex. 21 at ¶ 3.
[166] *Id.*, Ex. 19 at L0009416.
[167] *Id.*, Ex. 20 at ILMN_CRN280990.
[168] *Id.*, Ex. 4.

The SEC filings cited by plaintiffs are defendant's SEC filings in 2000, 2001, and 2002, before the BeadChips' introduction in September 2003.[169]  The citations to Downing's deposition also concern a discussion of those SEC filings.  Moreover, defendant states the journal articles, marketing materials, and user guides relied upon by plaintiffs were published or disseminated before the BeadChips' introduction.[170]  Defendant contends, therefore, that "there is nothing inconsistent about the fact that these early documents refer only to 'fiber optic bundles' (SAM) and do not reference Beach Chip.  The bottom-line is that by 2004 when the Agreement was signed, both parties were fully aware that 'BeadArray Technology" included both SAM and BeadChip."[171]

The court finds plaintiffs have not raised a genuine issue of material fact on this issue, and grants defendant's motion for summary judgment that BeadChip and Sam are "Defined Products."

## 2.    "Modified Defined Products"

The Settlement Agreement defines "Modified Defined Product as "a product

---

[169] D.I. 175 at B191, B195, B201.

[170] Defendant notes only one document with a 2004 date, a January 26, 2004 document, is cited by plaintiffs as evidence that "BeadArray Technology" does not include BeadChip.  Defendant explains that document is a draft BETA version of a 2004 BeadArray Reader User Guide.  It maintains the reason that document "only mentions fiber optic bundle[s]" is because the BeadChip was not originally designed for use with Illumina's BeadArray Reader.  D.I. 179 at 19 (citing D.I. 180, Ex. 12 at 1-3).  Defendant states the BeadArray Reader was later modified to accommodate BeadChip, and the BETA version of the BeadArray Reader User Guide cited by plaintiffs was outdated as of March 12, 2004, well before the Settlement Agreement was executed.  It avers the revised version of the 2004 BeadArray Reader User Guide, which references both SAM and BeadChip, was published on March 12, 2004.  *Id.* (citing D.I. 180, Ex 13 at ILMN_CRN014543).

[171] D.I. 179 at 18.

(substantially similar to a Defined Product and having all of the 'steps' set forth on Exhibit 1 hereto) that is a modification of the Defined Product."[172]  Defendant moves for summary judgment that its GoldenGate and DASL assay performed using VeraCode Beads are "Modified Defined Products."  Plaintiffs argue there are disputed facts concerning whether the accused assays and products meet the requirement that each is:  (i) "substantially similar to a Defined Product"; (ii) has "all of the 'steps' set forth on Exhibit 1"; and (iii) is "a modification of the Defined Product."

Defendant argues its GoldenGate and DASL assays are "Modified Defined Products" when performed using VeraCode beads,[173] because "[t]he chemistry of the GoldenGate or DASL assay performed using VeraCode Beads is essentially identical to the chemistry used to perform steps one through four of Exhibit 1 using SAM and BeadChip as of August 2004."[174]  According to defendant, the only differences are: "[(1)] VeraCode provides faster hybridization time[; (2)] VeraCode decodes the beads at the time the assay is performed, as opposed to before it is performed[; and (3)] VeraCode digitally decodes the beads, whereas BeadArray uses oligo decoding."[175]  Defendant contends these "minor differences" do not vary any of the "steps" in Exhibit 1 because "[n]either the [settlement agreement] nor Exhibit 1 specify when or how beads must be decoded when performing the assay in order for the product to be considered a 'Defined Product.'"[176]

---

[172] D.I. 169, Ex. 3 at ¶ 1.4.
[173] D.I. 168 at 12.
[174] *Id.*; D.I. 169, Ex. 23.
[175] D.I. 168 at 12.
[176] *Id.* at 12-13.

Plaintiffs argue that, although they agree "substantially similar" means "essentially identical to," neither the plain meaning of the phrase nor the language of the Agreement requires the additional limitation to be "essentially identical *to the chemistry used to perform*" the steps of Exhibit 1. Plaintiffs also maintain defendant does not cite any evidence that "minor differences" is an appropriate measuring stick of substantial similarity.[177] They further dispute whether the BeadChip and VeraCode products, and assays that use those products, contain all of the steps of, or are substantially similar to, the Defined Product.[178] As discussed previously, "Defined Product" requires "an Illumina BeadArray" in the fifth step. Plaintiffs submit there is evidence that would permit a factfinder to conclude this step is missing from assays that use VeraCode products because these products are not BeadArrays.[179] Further, they point out the accused assays using VeraCode products are performed in substantially different ways from SAM products.[180]

The court first notes defendant only cites one exhibit to its opening brief in support of its argument that "using VeraCode Beads is essentially identical to the chemistry used to perform steps one through four of Exhibit 1 using SAM and BeadChip as of August 2004."[181] That document states "biggest difference" between the SAM-based and VeraCode-based protocol is the "VeraCode-based protocol takes two days,

---

[177] D.I. 173 at 26.
[178] *Id.* (citing its arguments and evidence with regard to Defined Products on page 23 of it brief).
[179] *Id.* at 26-27.
[180] D.I. 175 at B1105 (describing differences between VeraCode and SAM).
[181] D.I. 168 at 12 (citing D.I. 180, Ex. 23 (3/5/07 FAQs for VeraCode)).

whereas the SAM-based protocol takes three."[182]  It also states, however, after a certain

point, "[t]he workflows differ from this point on, as the VeraCode-based GG assay has a

clearly defined sample addition step, a separate hybridization in the Vortemp (vs. oven

for SAMS), its own wash protocol, and a separate scan protocol for the BeadXpress

reader, *all very different from the SAM protocols for the analogous steps*–all detailed in

the manual."[183]  Although defendant contends plaintiffs point to "irrelevant differences" in

VeraCode "because VeraCode uses the same steps as are set forth in Exhibit 1 of the

Settlement Agreement,"[184] the court is not persuaded that the single document cited by

defendant, and its arguments related thereto, establish that VeraCode meets the

definition of a Modified Defined Product.[185]  Consequently, defendant's motion for

summary judgment that VeraCode is a Modified Defined Product is denied.

### 3.    "Blocking Patents"

Pursuant to the Settlement Agreement, "Blocking Patents" are defined as:

> all patents, both domestic and foreign counterparts, either currently or
> after the Effective Date, owned or licensed by Applera, that claim
> inventions that would necessarily be infringed by Illumina or its customers
> as a direct result of their manufacture, use, or sale of the Defined Product,
> but excluding the Excluded Patent Claims.[186]

Both parties cross move for summary judgment on the issue of whether the

patents-in-suit are Blocking Patents.

---

[182] D.I. 180, Ex. 23 at ILMN_CRN384299.
[183] *Id.* (emphasis added).
[184] D.I. 179 at 21.
[185] *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c)
mandates the entry of summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element essential to that party's case,
and on which that party will bear the burden of proof at trial.").
[186] D.I. 174, Settlement and Cross License Agreement at A002.

### a.    "[O]wned or licensed by Applera"

Plaintiffs move for summary judgment that none of the patents-in-suit are "owned or licensed by Applera."  Plaintiffs state that two of the ten patents-in-suit did not exist before Applera ceased to exist on November 21, 2008.[187]  They argue that because those patents issued after Applera ceased to exist, they could never have been "owned or licensed by Applera."[188]

Plaintiffs also contend none of the ten patents-in-suit was "owned or licensed by Applera" when the accusation of infringement was made that allegedly triggered the covenant.  They note when this suit was filed in 2010, Cornell Research Foundation was the patent owner, Life Technologies was the exclusive licensee, and Applera had not existed for many months.  Plaintiffs contend the Settlement Agreement does not define Applera in such a way as to cover patents owned or licensed by Applera's Successor, Applied Biosystems, but had it done so, Applied Biosystems does not own or license any of the patents-in-suit.

Defendant does not dispute Life Technologies is the exclusive licensee of the patents-in-suit, nor does it dispute plaintiff's assertion that the Settlement Agreement does not define Applera in such a way as to cover patents owned or licensed by Applera's Successor.  Instead, it repeats its argument, previously rejected by the court, that the preamble of the Settlement Agreement defines "Applera" to include Applera's "Affiliates and affiliates."[189]

---

[187] D.I. 173 at 18 (citing D.I. 63, Ex. I ('746 patent, issued Feb. 22, 2011); Ex. K ('233 patent, issued Feb. 22, 2011)).

[188] *Id.* at 18-19.

[189] D.I. 179 at 16.

The court agreed with defendant that Applied Biosystems stepped into the shoes of Applera and, because Life Technologies acquired all or substantially all of Applera with its acquisition of Applied Biosystems, Life Technologies is Applera's Successor. Applied Biosystems, however, does not own or license the patents-in-suit; the parties agree Life Technologies is the exclusive licensee of those patents.  In light of defendant's concession that "the question is *not* whether the [Settlement] Agreement covers patents owned or licensed by Applera's Successor,"[190] the court grants plaintiffs motion for summary judgment that the patents-in-suit are not owned or licensed by Applera as required by the definition of "Blocking Patents."[191]

### b.     "[W]ould necessarily be infringed by . . . the Defined Product"

The parties each moved for summary judgment on whether the Cornell patents are "necessarily . . . infringed by . . . the Defined Product."  "Defined Product" is "Illumina's GoldenGate™ assay, as described in Exhibit 1."[192]  Exhibit 1 lists the five steps of the assay:

> Hybridization of at least two oligonucleotide probes to a target nucleic acid material, where the target material may be DNA, cDNA, RNA, or artificial oligonucleotide template;
>
> Extension and ligation of one probe to the other while the probes are hybridized to the target material;

---

[190] *Id.* (emphasis in original).

[191] In the section of its opening brief captioned "The Patents-In-Suit Are 'Blocking Patents,'" defendant did not present argument that the patents-in-suit were owned or licensed by Applera.  To the extent its motion for summary judgment that the patents-in-suit *are* Blocking Patents requires that determination, and defendant implicitly so moved, the court denies defendant's motion on this issue.

[192] D.I. 169, Ex. 3 at ¶ 1.2.

Eluting the extended and ligated probes from the target material;

Universal PCR, rolling circle, random priming, T4/Eberwine, strand displacement, TMA (transcripted mediated amplification), LCR (ligase chain reaction), MDA (multiple displacement amplification) or SPIA amplification of the extended and ligated probes to generate labeled amplicons; and

Detection of the amplicons on an Illumina BeadArray.[193]

Plaintiffs point out defendant never argued the definition of "Blocking Patents" to be ambiguous nor identified any evidence or other information which it contends bears on the construction of that language.[194]   Under California law, "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."[195]   For assistance in defining a word, the court may use a dictionary,[196] and the dictionary definition of "necessarily" is "as a necessary result; inevitably."[197]

Plaintiffs argue the meanings of "Blocking Patents" and "necessarily infringed" were commonly known, through judicial interpretation, at the time of the Settlement Agreement.[198]   If an "accused device can be used at any given time in a noninfringing

---

[193] D.I. 169, Ex. 3 at L0000212.

[194] *Id.* at A053-54 ("Illumina does not contend that any term or phrase in the Settlement and Cross License Agreement is ambiguous").

[195] *Cal. Civ. Code* § 1644.

[196] *See, e.g., Walker v. Gomez*, 609 F. Supp. 2d 1149, 1156 (S.D. Cal. 2009) (noting in order "[t]o determine the ordinary and popular meaning of a word, the court will typically consult a dictionary").

[197] D.I. 174 at A096 (THE OXFORD AMERICAN COLLEGE DICTIONARY at 905 (2002 ed.)); *see also* D.I. 174, (Flatley Depo.) at A084, 146:15-20 (noting the dictionary he probably owned was an Oxford dictionary).

[198] D.I. 173 at 20.

manner, the accused device does not necessarily infringe" a patent.[199]  Further, "[i]f all

of the claims are valid, the parties here have blocking patents.  That is, neither can

practice its invention and avoid infringing the other's without a license."[200]

Plaintiffs argue they are entitled to summary judgment because defendant

admitted the Defined Product can be practiced without infringing any of the patents in

suit,[201] and further note the Defined Product expressly permits the use of nine different

amplification methods, with only one of which, PCR, covered by the patent claims.[202]

Defendant admitted the Defined Product can be practiced with different amplification

methods.[203]

Defendant argues a patent is "necessarily infringed" if it covers an invention that

requires the performance of the five steps of its GoldenGate assay.[204]  Defendant

asserts the nine different amplification methods listed in Step 4 allow for broad freedom

when selecting an amplification method.[205]  Defendant represents its primary purpose

for executing the Settlement Agreement was to have freedom to operate its GoldenGate

_____

[199] *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).

[200] *Rohm and Haas Co. v. Mobil Oil Corp.*, 718 F. Supp. 274, 285 (D. Del. 1989).

[201] D.I. 174 at A034-42 (Illumina Resp. to Request for Admission) (noting defendant's statement that "Illumina admit[ted] that there are ways to practice the Defined Product, as defined in the Settlement and Cross License Agreement, without infringing [U.S. Patent Nos. 6,797,470; 7,083,917; 7,166,434; 7,312,039; 7,320,865; 7,332,285; 7,364,858; 7,429,453; 7,892,746; 7,893,233]").

[202] *Id.* at A012 (Settlement and Cross License Agreement); A047-48; A048-49.

[203] *Id.* at A047-48 (Illumina Resp. to Request for Admission) (noting defendant admitted "the GoldenGate Assay described in Exhibit 1 of the Settlement and Cross Licence Agreement" "can be performed without using polymerase chain reaction ("PCR") amplification;" "can be performed using rolling circle amplification;" and "can be performed using transcripted mediated amplification.").

[204] D.I. 168 at 14.

[205] *Id.*

assay in the future.[206]

Under plaintiffs' argument, defendant contends the covenant not to sue would essentially be worthless because it would not protect its key commercial product, the GoldenGate assay,[207] for which protection was sought over the long term.[208]  Defendant also contends plaintiffs' application of the law is incorrect, because in determining whether an accused product "necessarily infringes," one must look to the product as it existed at the time it was accused.[209]

The court finds the patented-in-suit patents are "necessarily infringed" by the "Defined Product."  Initially, the court agrees with defendant that it seems illogical that, given the importance of the GoldenGate asset to Illumina in 2004, it would have entered an agreement that rendered the covenant not to sue essentially worthless.  Case law also supports defendant's position that the focus is on whether an accused product "necessarily infringes" begins with the accused product as it existed at the time it was accused.[210]  Defendant's admission that the "Defined Product," e.g., "Illumina's

---

[206] *Id.* at 13.

[207] *Id.* at 14-15.

[208] D.I. 169, Ex. 26, Jay Flatley Depo. at 90:24-91:4 (stating goal of settlement agreement was "to make sure that we couldn't be sued under those patents, nor could we be sued on any other patents subsequent to signing this that related to the products that we defined in the agreement or any products that we considered to be derivative to that product").

[209] D.I. 179 at 22.

[210] *See, e.g., ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) ("Because the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe the '989 patent."); *Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 995 (Fed. Cir. 2009) (equating "necessarily infringes" with "necessarily [having] to be placed in the infringing configuration," and determining simply being capable of being put into the claimed configuration is insufficient for a finding of infringement); *Dynacore holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1276 (Fed. Cir. 2004) (equating

GoldenGate™ assay, as described in Exhibit 1," is capable of being practiced without infringing the patents-in-suit does not change the fact that the Defined Product, as it existed at the time it was accused, necessarily infringes the patents-in-suit. Consequently, the court grants defendant's motion for summary judgment and denies plaintiffs' motion for summary judgment.

### 4.    "Excluded Patent Claims"

The Settlement Agreement defines "Excluded Patent Claims" as "claims in patents, both domestic and foreign counterparts, either currently or after the Effective Date, owned or licensed by Applera that claim inventions that are instruments, enzymes, dyes, nucleic acid sequences, polymerase chain reaction (PCR) methods, or software."[211]  Defendant moves for summary judgment that the asserted patent claims are not the "Excluded Patent Claims."

### a.    "Patents . . . that claim inventions that are instruments"

Defendant submits the claims of the '917 and '233 patents (the "Array Patents") are not Excluded Patent Claims because they do not "claim inventions that are instruments."[212]  Defendant argues "a patent claiming an invention that is an array is *not* the same thing as a patent that claims an invention that is an instrument."[213]  Defendant contends "[t]he term 'instrument' has a well-understood meaning in the biotechnology

---

"necessarily infringe" with "substantial[ly] non-infringing," and finding no determination of liability if there are substantially non-infringing uses of the defendant's products); *Genentech, Inc. v. Trs. of Univ. of Pa.*, No. 10-CV-02037 LHK, 2012 WL 1670167, at *11 (N.D. Cal. May 14, 2012) ("[a]n accused product does not 'necessarily infringe' if it 'can be used at any given time in a noninfringing manner'" (citation omitted)).

[211] D.I. 169, Ex. 3 at ¶ 1.3.
[212] D.I. 168 at 16.
[213] *Id.* at 15 (emphasis in original).

industry" and, "[i]n this case, instrument refers to the HiScan, IScan and Bead Array Reader" which are "instruments that contain optics, software, and other components for reading the results of experiments *contained* on arrays."[214]  Defendant states "[a]rrays are disposable items, which are inserted into the instrument, for example, Illumina's BeadArrays."[215]

Defendant points out the words "instrument" and "array" consistently appear in the Settlement Agreement separated by a comma:  "existing or future Illumina products or services including, without limitation, *arrays, instruments,* oligonucleotide products, reagents, or commercial services";[216] "existing or future Applera products or services including, without limitation, *arrays, instruments,* oligonucleotide products, reagents, or commercial services.";[217] "existing or future Applera products or services including, without limitation, *arrays, instruments,* oligonucleotide products, reagents, or commercial services."[218]  Defendant submits that under basic rules of contract interpretation, since the terms are listed separately throughout the settlement agreement, the parties intended and understood the terms to have different meanings.[219]

Defendant also maintains both the parties' and the industry's usage of the terms confirm that an array is not an instrument.  For instance, Applera's 2005 Annual Report

---

[214] *Id.* (emphasis in original); D.I. 169, Ex. 30 at ILMN_CRN175346 (noting "[t]he BeadArray Reader is a high-performance instrument"); *id.*, Ex. 29.

[215] D.I. 169, Ex. 29 (showing "Array Formats" and a "Sentrix® Array Matrix" being inserted into a "BeadStation" or "BeadArray Platform").

[216] *Id.*, Ex. 3 at ¶ 4.5 (emphasis added).

[217] *Id.* at ¶ 4.6 (emphasis added).

[218] *Id.* at ¶ 4.8 (emphasis added).

[219] D.I. 168 at 16-17.

divided the company's profits into two major categories:  (1) instrument sales and (2)

consumable sales.[220]  The consumables included chemical reagents and other

disposables and arrays.[221]  Similarly, Applied Biosystems' current website at present

distinguishes between instruments and arrays.[222]  Dr. Michael Hunkapiller, former

President of the Applied Biosystems Group of Applera, stated that prior to the

Settlement Agreement, his company did not classify a consumable as an instrument.[223]

Defendant's expert, Dr. Stacey Gabriel, also testified no one in the industry would ever

call an array an instrument.[224]  Defendant points out that, historically, it has

distinguished the two terms in public usage.[225]

---

[220] D.I. 169, Ex. 32 (Applera 2005 Annual Report) at 13, 32, 36, 37, 38, 43, 44, 82.

[221] *Id.*  For example, that document describes "consumable products" as "chemical reagents and *other disposables* used in conjunction with our various *instrument systems* . . . ." *Id.* at 13 (emphasis added); *id.* at 36 (stating that "Consumables" "included assays"); *id.*, Ex. 32 at 38 ("Consumables" included sales of particular assay products).

[222] *Id.*, Ex. 34 (separately listing products under the headings "Gene Expression Analysis Instruments" and "Gene Expression Assays, Plates & Arrays").

[223] *Id.*, Ex. 33 (Hunkapiller Depo.) at 41:23-42:5 ("Q.  Can you think of any example at Applied Biosystems Inc. where an item that was consumable or disposable was referred to as an instrument?  "Consumables referred to as an instrument.  Not that I recall."(objection omitted)).

[224] *Id.*, Ex. 31 (Gabriel Expert Rpt.) at 3, 10 (stating the term "instrument" is "widely understood" to refer to a category distinct from "consumable," and the term "consumable" includes the term "arrays").  Dr. Gabriel describes instruments as repeatedly usable over an extended period of time, and arrays, or consumables, as generally for single use.  *Id.*, Ex. 31 at ¶¶ 2, 5-7.

[225] *Id.*, Ex. 35 (Illumina 2002 Form 10-K Form) at 7 ("Illumina will manufacture the arrays and Applied Biosystems will manufacture the instrument and reagent kits and have responsibility for sales and marketing of the system."; "[Illumina] will develop and manufacture the Array of Arrays and and Applied Biosystems will develop and manufacture the detection instrument and the reagent kits."); *id.*, Ex. 19 (Illumina 2003 Annual Report) at L0009419 ("[T]he BeadArray Reader . . . is an instrument that uses a laser to read the results of experiments that are captured on . . . Sentrix Array Matrices and BeadChips . . . ."); *id.*, Ex. 19 at L0009418 (describing "disposable Sentrix Arrays

Plaintiffs contend questions of fact regarding the meaning of "instrument" and how that definition is applied to the patent claims at issue preclude summary judgment.

Plaintiffs state Illumina's expert, Dr. Gabriel, testified that many definitions of "instrument" in the biotechnology and life sciences fields are satisfied by patents directed to arrays.[226]  Plaintiffs note their expert, Dr. Kevin Struhl, similarly opined that an "instrument" "is a device that is made or adapted for a specific purpose."[227]  Dr. Struhl cited three dictionaries that are consistent with his definition of "instrument."[228]  Plaintiffs also argue "consumables" is a budgetary, not a scientific term, which relates to cost and not whether an item is an instrument.[229]  According to plaintiffs, arrays can be reused.[230]  Plaintiffs further contend the patents do not simply claim arrays; rather, they claim devices "comprising" multiple features, including an array.[231]  Since the legal term "'comprising' creates a presumption that the recited elements are only a part of the

---

and BeadChips, GoldenGate reagent kits" and "BeadArray Reader scanning instruments"); *id.*, Ex. 45 (Illumina 2011 Form 10-K) at 11 (describing "instruments and consumables (which include reagents, flow cells, and BeadChips) . . . .").

[226] D.I. 175 at B1665, 43:14-21 (Gabriel Depo.) (testifying "an instrument is a device to perform a step of a process" and "an array is a device to perform a step of a process"); *id.* at B1666, 45:5-12 (Gabriel Depo.) (testifying "an instrument is a device to run a process for a specific purpose" and "an array is used to run a process for a specific purpose"); *id.* at B1667, 50:4-10 (Gabriel Depo.) (testifying "an instrument is a device used for measurements" and "an array is a device used for measurements").

[227] *Id.* at B1178, ¶ 77 (Struhl Rebut. Expert Rpt.).  Dr. Struhl also states "the term 'instruments' can refer to devices that can be used to run a process for a specific purpose and to devices that can be used to measure things . . . ."). *Id.* at B1180, ¶ 82 (Struhl Rebuttal Expert Rpt.).

[228] *Id.* at B1180-81, ¶ 82 (Struhl Rebut. Expert Rpt.).

[229] *Id.* at B1682, 61:14-64:4 (Struhl Depo.).

[230] *Id.* at B1671, 69:8-9 (Gabriel Depo.); *id.* at B1181, ¶ 84 (Struhl Rebut. Expert Rpt.); *id.* at B1183-85, ¶¶ 90, 93 (Struhl Rebut. Expert Rpt.); *id.* at B1686, 81:3-83:19 (Struhl Depo.); *id.* at B1687, 86:7-15.

[231] D.I. 63, Exs. B, I, K (citing claim 7).

device," such claims do not exclude additional, unrecited elements.[232]  Finally, plaintiffs

agree that the usage of the terms "array" and "instrument" together in the Settlement

Agreement means they are not synonymous.  Plaintiffs suggest, however, that "an array

can clearly qualify as an instrument, but not all instruments (consider the readers

discussed above) are arrays."[233]

The court finds there is a genuine issue as to whether an "array" is an

"instrument."  As noted previously, an "Excluded Patent Claim" includes a claim that

covers inventions that are instruments.  The parties submit competing evidence on

whether an "array" as used in the claims is an "instrument."  Because the meaning of

patent terms are legitimately contested, "a factual dispute arises, precluding summary

judgment."[234]

### b. "Patents . . . that claim inventions that are . . . polymerase chain reaction (PCR) methods"

The covenant not to sue also excludes patent claims that "claim *inventions* that

are . . . polymerase chain reaction (PCR) methods."[235]  Defendant argues "a patent

claiming a detection method that *uses* PCR as one step of that detection method is *not*

the same thing as a patent that claims an *invention* that *is* a PCR method."[236]

Defendant submits the patents-in-suit are not Excluded Patent Claims because they do

---

[232] *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).
[233] D.I. 173 at 35.
[234] *Gen. Elec. Co. v. Hoechst Celanese Corp.*, 698 F. Supp. 1181, 1187 (D. Del. 1988).
[235] D.I. 169, Ex. 3 at ¶ 1.3 (emphasis added).
[236] D.I. 168 at 15 (emphasis in original).

not claim inventions that are PCR methods.[237]

Defendant argues there is nothing novel about PCR as it is used in the patents-in-suit, and nowhere do the patents describe a new method of doing PCR.  Defendant states the PCR method utilized in those patents, Universal PCR, was well-known in 2004.  It states the first PCR method was invented in 1983 by Dr. Kary B. Mullis.[238] Defendant explains that after Mullis' original patents, many variations and improvements of the PCR protocol were developed and patented, such as "real-time PCR" and "quantitative PCR" as well as others.[239]  Defendant argues it is these variations and improvements on the PCR amplification protocol itself that constitute "claims in patents . . . that claim *inventions* that are . . . polymerase chain reaction (PCR) methods."[240]

Defendant represents the original Mullis patents and related PCR patents were still in effect at the time of the Settlement Agreement, and were the centerpiece of a "PCR Licencing Program" run by Life Technologies through today.[241]  According to defendant, it was this separate PCR Licensing Program that the parties were carving out of the Settlement Agreement.  Defendant notes none of the patents-in-suit is part of the PCR Licensing Program, which defendant argues confirms that Life Technologies understands that the asserted patents are not claiming "inventions" that are PCR methods.

Defendant contends that although some of the asserted claims contain the step

---

[237] *Id.* at 18.
[238] D.I. 169, Ex. 37.
[239] *Id.*, Ex. 38.
[240] *Id.*, Ex. 3 at ¶ 1.3 (emphasis added).
[241] *Id.*, Exs. 39-41 (licensing agreements).

48

of performing PCR, they are not claiming a new or novel way to perform PCR.

Defendant reiterates that simply because asserted claims contain a PCR step, does not

mean that they *are* PCR methods.  Similarly, it states the mere fact that GoldenGate in

Exhibit 1 contains a PCR step, does not mean that it is a PCR *method*.  Defendant

concludes the mere combination of the step of basic PCR with an allegedly new method

"for identifying one or more target nucleotide sequences," does not mean it "claim[s]

*inventions* that are . . . (PCR) methods."[242]

Plaintiffs argue there is "evidence in the record from which a reasonable fact

finder could conclude the term 'PCR methods' refers to methods in which PCR is one of

the steps, along with other, non-PCR steps."[243]  In support of their position, they

reference their expert, Dr. Struhl's, report,[244] treatises,[245] peer reviewed journal

articles,[246] and Illumina's own usage.[247]  According to Dr. Struhl, the '470, '434, '039,

'865, '285 and '453 patents claim inventions that are PCR methods.[248]  According to

plaintiffs, since determining whether a patent claims a "PCR method" is highly

subjective and fact driven, summary judgment is inappropriate.

---

[242] *Id.*, Ex. 3 at ¶ 1.3 (emphasis added).

[243] D.I. 173 at 31.

[244] D.I. 175 at B1164, B1167-74 (Struhl Rebut. Expert Rpt.) (explaining how PCR methods means any method that includes PCR as a step in the overall method or process).

[245] *Id.* at B1167-72; B1234 (Struhl Rebut. Expert Rpt.) (stating "[s]everal PCR methods have been developed . . . .  One of these, litigation-mediated PCR, has broad applications including genomic footprinting and sequencing").

[246] *Id.* at B1167-72 (Struhl Rebut. Expert Rpt.); B1368; B1383; B1388; B1390-91; B1399; B1409; B1410.

[247] *Id.* at B1172-73; B1422; B1425; B1429; B1449; B1477; B1660-62 (Gabriel Depo.) at 18:17-23, 21:22-24, 25:16-21, 25:22-24.

[248] *Id.* at B1174-78 (Struhl Rebut. Expert Rpt.).

The court agrees with defendant that "Plaintiffs' argument boils down to the assertion that, merely because the claims of the patents contain the step of PCR the claims claim 'inventions that are' PCR methods."[249]  Plaintiffs have not demonstrated that the specification describes a novel PCR method that is claimed in the asserted claims.  Indeed, plaintiffs' expert, Dr. Struhl acknowledged that "the essence" of the PCR method Mullis invented in the 1980s is "definitely the same" as the PCR method utilized by the asserted claims.[250]  The claims recite "a method for *identifying* one or more different target nucleotide sequences"; a PCR method is used as one step in that invention.  Consequently, the court grants defendant's motion for summary judgment that the asserted claims reciting PCR as a step are not Excluded Patent Claims.

## F.    Discussion - Motion For Summary Judgment - Standing

Standing is "a jurisdictional requirement which remains open to review at all stages of the litigation."[251]  Once standing is challenged, the party seeking to invoke the court's jurisdiction has the burden of establishing its standing.[252]

### 1.    Cornell and Applied Biosystems

Defendant moves for summary judgment that neither Cornell and Applied

---

[249] D.I. 179 at 24.  The court also agrees with defendant that it is telling that plaintiffs did not dispute, or respond to, defendant pointing out that Life Technologies and its predecessors had, at the time of the Settlement Agreement, a "PCR Licensing Program" that continues through today.  Despite the "PCR Licensing Program" being established to monetize and license PCR method patents, the asserted patents are not part of that program.  *Id.* at 27.

[250] D.I. 180, Ex. 25 (Struhl Depo.) at 150:18-151:19.

[251] *Nat'l Org. For Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994); *In re ANC Rental Corp.*, 280 B.R. 808, 815 (D. Del. 2002).

[252] *MobileMedia Ideas, LLC v. Apple Inc.*, C.A. No. 10-258 SLR, 2012 WL 3528107, at *5 (D. Del. Aug. 16, 2012).

Biosystems have standing to bring this action.   Defendant asserts Cornell lacks

independent standing in this case without Life Technologies.   On December 16, 2009,

Cornell gave Life Technologies an exclusive, worldwide, perpetual license to make, use,

and sell products embodying the patents in suit.[253]   Pursuant to this license, Cornell

gave Life Technologies all rights to bring suit against defendant for infringement.[254]

Thus, defendant argues Life Technologies was given sole standing.[255]   Defendant also

contends Applied Biosystems lacks standing because Life Technologies is the exclusive

licensee of the patents-in-suit, and plaintiffs have not claimed Applied Biosystems has

any rights to those patents.[256]

Plaintiffs counter, arguing the standing issue is not ripe for summary judgment

because discovery on the subject has not been conducted, in part due to defendant's

conduct.[257]   They contend defendant never sought standing related discovery.[258]

Plaintiffs also argue Cornell is not expressly prohibited from proceeding with this

litigation by itself.[259]

### a.    Cornell

---

[253] D.I. 169, Ex. 2 (2009 NELA) at L0019051-52, ¶¶ 3.1, 3.2, 3.3.

[254] *Id.*, Ex. 2 at L0019062, ¶¶ 14.1, 14.2, 14.4.

[255] D.I. 168 at 10.

[256] *Id.*; *id.* at 10 ("[Applied Biosystems] lacks standing because it has asserted no ownership interest in the patents-in-suit.").

[257] *Paris v. Christiana Care Visiting Nurse Ass'n*, 197 F. Supp. 2d 111, 116 (D. Del. 2002) (stating when deciding a motion for summary judgment, a "nonmovant's evidence . . . must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof."); *see also* D.I. 87 at 2-3 (showing no mention of the standing issue in discovery order); D.I. 175 at B1777, B1790-91.

[258] D.I. 87 at 2-3; D.I. 175 at B1777, 1790-91.

[259] D.I. 169, Ex. 2 at L0019062, ¶ 14.2.   Because the court determines, below, that Cornell and Applied Biosystems do not lack standing, the parties' arguments concerning the ripeness of this issue need not be addressed.

Defendant acknowledges Cornell only lacks standing to proceed in this case without Life Technologies.[260]  In light of the court's determination, above, that the patents-in-suit are not "owned or licensed by Applera," as required by the definition of "Blocking Patents," the covenant not to sue does not prohibit Life Technologies from bringing this action.  Since defendant's argument that Cornell lacks standing is based on its position, previously rejected, that Life Technologies is prohibited from bringing this action its motion for summary judgment that Cornell lacks standing is denied.

### b.    Applied Biosystems

Defendant argues Applied Biosystems lacks standing to bring this suit because Life Technologies is the exclusive licensee of the patents-in-suit, and Applied Biosystems no rights to those patents.  Again, because the court determined the patents-in-suit are not "owned or licensed by Applera," the covenant not to sue would not prohibit Applied Biosystems from bringing this action.  Additionally, the 2009 NELA demonstrates Applied Biosystems does not lack standing.

The 2009 NELA recites:

> If within ninety (90) days of the Effective Date LICENSEE and/or its Affiliates has not granted a sublicense to Illumina Inc. and/or its Affiliates pursuant to this Article 14, LICENSEE and/or its Affiliates shall promptly initiate legal proceeding(s) against Illumina and/or its Affiliates in its sole discretion.  CRF will join as a party in such legal proceeding(s).[261]

Further:

> LICENSEE and/or its Affiliates will (a) fully control the legal proceeding described in this Article 14, and make all decisions related thereto,

---

[260] D.I. 168 at 9 ("Cornell lacks standing to proceed in this case without [Life Technologies].").

[261] D.I. 169, Ex. 2 at L0019062, ¶ 14.2.

including decisions related to filing, strategy and selection of counsel; and (b) fully control and make all decisions related to whether to settle any such legal proceeding.  LICENSORS shall not contact or otherwise correspond with Illumina Inc. and/or its Affiliates during any such legal proceeding against them regarding the legal proceeding, or settlement thereof, or regarding the Licensed Patents, the Licensed Applications, or this Agreement.  CRF shall be entitled to (a) a complete, unredacted, executed copy of any sublicense agreement entered into as a result of the legal proceeding, and (b) a complete, unredacted, executed copy of the settlement papers entered into as a result of the legal proceeding.[262]

Additionally:

LICENSORS will (a) fully cooperate with LICENSEE and/or its Affiliates in relation to any legal proceeding referenced in this Article 14 (including without limitation joining as a party or parties to such legal proceeding if they are an owner of a patent that is included in such legal proceeding, making its employees available for discussion and depositions, providing all requested discovery, and entering into a joint defense agreement or a common interest agreement), (b) will fully cooperate with any decisions or action taken or made by LICENSEE and/or its Affiliates related to such legal proceeding, and (c) fully cooperate with LICENSEE and/or its Affiliates in relation to any settlement and any decisions or action taken or made by LICENSEE and/or its Affiliates related to such settlement.[263]

The 2009 NELA defines "Affiliate" as "any entity Controlling, Controlled by, or under common Control with the referenced entity.  An Affiliate of LICENSEE shall include, but is not limited to, *Applied Biosystems, LLC*."[264]  As stated in the 2009 NELA, Applied Biosystems can also "initiate" a legal proceeding.

Consequently, defendant's motion that Applied Biosystems lacks standing is denied.

## IV. ORDER AND RECOMMENDED DISPOSITION

For the reasons contained herein, this court recommends that:

---

[262] *Id.* at ¶ 14.3.
[263] *Id.* at ¶ 14.4.
[264] D.I. 175 at B002 (2009 NELA) (emphasis added).

(1) Plaintiffs' motion to strike, alleging defendant's reply brief relies on inadmissible evidence from an incomplete record on the parties' settlement negotiations, including the negotiation history, draft settlement agreements, and correspondence (D.I. 184) is GRANTED.

(2) Plaintiffs' motion to strike, alleging defendant's reply brief contains arguments and alleged facts that were not included in defendant's opening brief (D.I. 184) is GRANTED IN PART AND DENIED IN PART.

(3) Defendant's motion for summary judgment, alleging Life Technologies and Applied Biosystems are bound by the covenant not to sue entered into by Applera as Applera's "Affiliates," affiliates," or "Successors" (D.I. 167) is GRANTED.

(4) Defendant's motion for summary judgment, alleging Cornell and Applied Biosystems lack standing to sue defendant because Cornell contractually waived its right to sue defendant for infringement, and Applied Biosystems has no ownership interest in the patents at issue (D.I. 167), is DENIED.

(5) Defendant's motion for summary judgment, alleging the covenant not to sue bars plaintiffs' infringement claims as it protects defendant from suits alleging infringement of the "Blocking Patents" by "Defined Products" and "Modified Defined Products," because the accused products are Defined and Modified Defined Products, the patents at issue are Blocking Patents, and the asserted patent claims are not the "Excluded Patent Claims" exempted from the covenant not to sue (D.I. 167) is DENIED.

(6) Plaintiffs' cross motion for summary judgment, alleging Life Technologies is not bound by the covenant not to sue because Life Technologies is not Applera, Applera's "Affiliates," "affiliates," or "Successors" (D.I. 172) is DENIED.

(7) Plaintiffs' cross motion for summary judgment, alleging Cornell is not bound by the covenant not to sue because Cornell is not Applera, Applera's "Affiliates," Applera's "affiliates," or Applera's "Successors" (D.I. 172) is GRANTED.

(8) Plaintiffs' cross motion for summary judgment, alleging the covenant not to sue protects defendant from suits alleging infringement of the "Blocking Patents" that are "owned or licensed by Applera," and the patents in suit are not owned or licensed by Applera (D.I. 172), is GRANTED.

(9) Plaintiffs' cross motion for summary judgment, alleging the covenant not to sue protects defendant from suits alleging infringement of the "Blocking Patents" that "would necessarily be infringed" by the sale, manufacture, or use of the "Defined Product," and the patents in suit are not necessarily infringed because the Defined Product can be used without infringing the patents (D.I. 172), is DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen days after being served with a copy of this Report and Recommendation.[265]  The objections and response to the objections are limited to ten pages each.

The parties are directed to the Court's standing Order in Non Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov.

---

[265] FED. R. CIV. P. 72(b)(2).

June 25, 2013                                   /s/ Mary Pat Thynge
                                        UNITED STATES MAGISTRATE JUDGE